Ready for argument in Wellman v. Bobcat Oil & Gas, Mr. Poling? May it please the court, my name is Jason Poling and I, along with my co-counsel Robert Waters, will be representing the Wellmans here this morning. This case is about whether a lease shall continue to be given legal effect when the producer has completely failed to fulfill its obligations during a certain period. The lease at issue in this case contains self-executing language that upon the occurrence of certain events that the lease is at its natural conclusion. That event in this instance is the cessation of the production of minerals. Is this the flat rate lease or a production lease? This lease has components that are both flat rate and production. The lease has a flat rate component for the production of natural gas and it has a one-eighth royalty for the production of oil. And which component is at issue here, the flat rate lease? It's our opinion, and I think this raises one of the issues with the district court's decision, is that there's not a dichotomy in the lease of, well, if we produce oil, then it's an oil lease and it's based on a royalty based on production. I'm not sure I understood your answer to the question. Okay. There is a component in the lease that is both, there's a flat rate component and a production based component. Ultimately, it doesn't matter because in Bruin, the primary case that the district court relied on, the whole, the district court read Bruin in a way that we think is incorrect, number one, but even if you assume that the district court read Bruin correctly, that presupposes that the payments were still made. And if you read Bruin, that's what it says. I do understand, but I understood the question to be, given that there is a dichotomy in the lease, what is in contention here, which aspect or which features of the lease are in contention? I believe both because there was no oil and there was no gas produced. Let's say, for instance, that Bobcat would have been producing oil and the gas would have ceased production, then they would probably be saved or possibly be saved. But that's not a fact that we're faced with. There's a complete cessation of production. Your abendum clause has a reduction clause in it, doesn't it? The abendum clause, yes, it does. And that's the whole crux of this case is that the production ceased, whether it be gas or oil, and that because of that, the lease ceased on its own terms because it's a determinable interest. I thought that the district court determined that the cessation of gas production was temporary. Does the record reflect a permanent total cessation of production? The district court did not reach the question of whether there's a temporary cessation of production. That's a question of fact. It said that temporary cessations of gas production do not terminate the contract. That is a correct statement of the law, but it did not make a finding of fact. Okay, and my question is what does the record reflect? Does the record reflect? I believe that the record reflects that the cessations were not temporary. In fact, West Virginia has a statute that says that there's a presumption of abandonment if there's greater than 24 months of non-production. In this case, but there were far greater than 24 months taken in the aggregate, and the statute does not say whether it's silent on whether it is continuous non-production for 24 months or whether it's an aggregate production. I think you have to look to the whole point of oil and gas leases. The point of oil and gas leases is to produce the minerals, and in this case, it is clear that Bobcat failed on that. Why would abandonment look to aggregation? The point of abandonment, rather like the point of adverse possession, is it's almost by definition durational, isn't it? No, because let's say that you have a lease and you have other leases in the area, and you decide, well, I'm just going to shut in this person's lease and not pay them any royalties, and I'm going to produce this other one, and the first royalty owner doesn't get anything, and that would not be beneficial to the royalty owner. And, in fact, the court has held that that's not permissible. The problem that I or a question that I had on the matter of production is that there were points in the record where you seemed to recognize or acknowledge that there was production. You indicate that or at one point you contended that Bobcat was actually producing gas without telling you, which seems to run in contradistinction to your argument that there has been a total cessation. It is true that that is contained in there, but it's not counterintuitive because the period at which the determinable interest came into effect, the operative moment is the second quarter of 2006. That's when the Wellmans did not get paid and there was no production. At that moment, the lease ceased to exist on its own terms, even under the court's interpretation of Bruin. Well, now, those three West Virginia cases, all three of them, there was some production, but in this case there was no production. Is that the distinction? That is correct. There was no production for some period of time? Yes, for greater than 24 months, 38% of the time in a 10-year period, this well produced nothing. How do you get that it was for greater than 24 months? Because you're doing your aggregate calculation? Is that how you get the 24 months? I'm offering that because Judge Duncan asked about that. It is our position that it does not have to be 24 months, that based on the terms of the lease, it can be one month. Now, where there's no production and no payment, then what would happen is that there would be a question of whether there's a question of fact with respect to whether the production was a temporary cessation of production. That's a question of fact. Like in the Bruin case, and the jury in the Bruin case found that periods as short as even five months, if they are not because of the reasons that give the producer an excuse under the temporary cessation of production doctrine, that they do not come into play. Clearly, in this case, that is true because Bobcat did not lose their market. Instead, they decided not to sell because they could not buy transportation at a cost that they thought. And I understood that. But going back to, I'm still not clear about your argument. You said that the question that we agreed, I think, that the district court looked at whether temporary cessation was enough to terminate the contract. And you said that was a correct statement of law. That's a statement of law, but the district court did not make a finding of fact on that. But you seem to be acknowledging that, or are you, that the cessation of gas production was, in fact, temporary? We are not acknowledging that. But there were periods in which gas was produced. So it was neither permanent, so it wasn't permanent. Well, I guess you'd say that from a non-legal standpoint, what we're saying is that the temporary cessation of production doctrine is not applicable to this case, and that requires a fact-finding. So should we send it back if there's no finding of fact? No. Because? Because the fact that the non-payment and the non-production came together is our... At any point, ever. That's correct. You said, so at any point. Well, then how can the temporary cessation doctrine have any meaning at all if any single instance of cessation of production and non-payment occurring at the same time ends the contract? Under this lease, it's our position there's no excuse in the lease. I think that if you found that, that that was not applicable, that the other choice that you would have would be to remand it to the district court for a factual determination about whether the temporary cessation of production doctrine is applicable. We believe that there's no evidence that it is applicable because the testimony of Bobcat's own witnesses says that they were shut in. That was a business decision they made, and that is analogous to the situation that was decided by the Fourth Circuit in Hutchinson against McHugh, where this case, that's the closest case to this case. There was a failure to pay rentals. There was a failure to produce, and the lease was declared to be forfeited. And in that case, the decision not to produce was purely a financial one, exactly the same as this decision. The producer did not feel that they were making enough profit from the market that was available, so they chose to shut it in. The problem for Bobcat in this situation is that you can't do that, especially and not pay. That's the biggest problem for them is they did not pay and they did not produce simultaneously. And that is why Hutchinson, and it was based on a business decision, not... How many months are you talking about that they did not pay and they did not produce? 2006, beginning on... The payment would have been due on... That's all right. My question is then after that, in 2007, did your clients accept payments from Bobcat? And if so, how would that impact your argument? They did accept payments, but they had gone to Bobcat and said, hey, listen, we've got a problem here. We need to figure this out. But they did accept some payments when they were trying to get the situation worked out with Bobcat over the status of the lease. And this is a case not cited in our brief, but this court has held an imperial callery against OxyUSA, specifically that the cashing of royalty checks during a period where there's contention that there's a problem with the lease, that that does not mean that the dispute is waived, which is also consistent with all the other general cases that we cited in our brief. The purpose of me bringing up this case is to make sure the court understands that there's not some special thing with minerals that you can pay partial or the very cashing of a check without a real compromise is fatal to a case like the Wellmans. During that time that they accepted checks in 2007, was there production going on? I think that there was some production on and off. The Wellmans did not know about it. It was not publicly reported. And that's where the Wellmans didn't know that there was production ongoing because it had been represented to them that there wasn't any, but then one day they saw Bobcat's equipment on the well site, and that's when they went and inspected and found out that the representations that had been made to them were in fact false. And it really didn't matter to the Wellmans under this lease whether there was production or not because this is a flat rate lease and they were getting the royalty payments. There would be after the period at which the moment the lease ceased on its own terms. After that is when the Wellmans, under West Virginia law, you can't have a lease like this anymore. It's illegal. It's not permitted under West Virginia law. So at that point, the question becomes not are they receiving the proper payments, but the question becomes do they know about the trespass to the extent that they know they have a cause of action. And they didn't know that until in 2008. Thank you. Are there any more questions? No questions. Mr. Perry? Good morning. My name is Matthew Perry, and I am counsel for the Appali Bobcat Oil and Gas Company, Inc. This appeal can really be brought down into two separate issues. First is to be resolved by the court, what is the effect of a temporary cessation of production in the secondary term of a flat rate royalty lease? The second issue is if, in fact, there was nonpayment, which Bobcat does not concede, by the way, but if there was nonpayment during the term and then subsequent acceptance of other payments, what is that effect under the lease based on West Virginia law? In this case, the district court granted summary judgment without having to resolve any factual disputes because it found that under the Bruin case that a cessation of production is not relevant to the continuation of the lease. And as far as the payments go, based on waiver, the court found, and it's not in dispute that Wellmans accepted subsequent payments after the alleged mispayments. What do you do about the subvention clause, which calls for production? Well, I think that both of these issues, Judge Boyd, comes down to the interpretation of the lease. And West Virginia Supreme Court has interpreted the term produced in two separate manners based on the type of the lease. In a production-based lease where royalties are based on production, the court has found that produced means produced in paying quantities, and that's where the error occurred in the Bruin case because in that case you were dealing with a flat rate royalty case, but the circuit court in that case was instructing the jury that produced under that lease meant produced in paying quantities. So if you look at Bruin, Bruin talks about what does produced mean with respect to a flat rate lease, and they hold in that case that quantity of production is not relevant to the continuation of the term. But quantity versus no production, there's two different things, aren't there? Well, if it's not relevant, I would argue that it doesn't matter if the production is zero or if the production is minimal or if the production is large. It's not relevant to the issue of whether or not the lease continues. The thing that troubles me a little bit is the West Virginia case, as it was with all the sites, including Bruin, there was some production, whereas here, for various periods of time, there was no production. Well, and that brings me to one of the points, and it's a little bit of an unorthodox record in this case because we actually have some of the documents from the Bruin case. And while it's not contained in my briefs, prior to oral argument, I went through the well records in that case to look at what exactly happened in the case. There were nine different wells that were involved in the case, but all but one of them had ceased operation as of 1946. There was only one well in production from 1947 to 1982, and that was well F-12721. If you look at the well records for that particular well, there were cessations or zero production in January of 1962, January of 1963, April of 1964, September through December 1978, and April to May of 1989. In the Bruin case, in the facts, the Bruins argued that there was a cessation sometime between 1921 and 1978. So you have within this record evidence that there was zero production for periods of time even in the Bruin lease. The Bruin case also makes a very clear distinction between flat rate leases and production-based leases, and it cites to the Goodwin v. Wright case, which again holds that production and a habendum clause or thereafter clause in the lease means production in paying quantities. But again, that was a lease in which the royalties were based on production and were not flat rate. In addition to the Bruin case, you have two cases out of West Virginia, the McGraw case and the McCutcheon case that both dealt with flat rate royalty leases, and both of which involved disputes that occurred in the secondary term of the lease. In both McGraw and in McCutcheon, there was no production period. There was no production in the primary term, and there was no production in the secondary term. Yet the court found that because there had been oil and or gas discovered, that there was a vested right that occurred under the lease, and therefore the gas company was entitled to continue that lease and its operation. There was some discussion also about West Virginia Code 36-4-9A, which is the statute that provides for a presumptive abandonment in the event of non-production for a period of 24 months. I disagree with the argument that that can be accumulated over time, because necessarily you're going to have periods of time in which there's no production to do maintenance or other events that may occur. That's a recognized set of maintenance. It is. Any of that in this case? It is, but also a recognized exception of that statute is flat-rate leases. They are not subject to the presumption of abandonment over 24 months. So the question is why would there be an exception for flat-rate royalty leases under that statute? The only answer that I can come up with is because production is not relevant to the continuation of the lease. What is relevant is that you make flat-rate royalty payments to the landowner, and if that goes forward, then the gas company is entitled to operate that well until there is an exhaustion of the minerals from that well. I'll also talk a little bit about the temporary cessation doctrine. I have not argued that the temporary cessation doctrine applies for two reasons. First off, I think it would be a jury issue. It's not appropriate for summary judgment. The second issue, though, and probably more importantly is if production is not relevant to the continuation of a flat-rate royalty lease, then the temporary cessation doctrine would not be applicable to flat-rate royalty. And there are no cases that have been cited at the court, and none that I'm aware of in West Virginia, where the temporary cessation doctrine has been applied to a flat-rate royalty lease. And if you look at the Bryan case, the Bryan case is a production-based lease. Bryan paid a percentage of the royalty based on the production for both oil and gas. Go ahead. Were you going to talk about accord and satisfaction and the whole issue of the late payments? Yes, ma'am. First off, I would assert that, as I mentioned before, Bobcat Oil and Gas does not concede that there were any payments that were missed. There is a period of time in which the timing of the payments changed, and that was in 2006. And there was about a 60-day difference between the timing of the payments. That's conceded. But what's also undisputed is that this lease did not contain a non-waiver provision, which you typically see in a lot of leases and a lot of contracts today, that if there's a breach, it doesn't necessarily mean that you're waiving that particular right or remedy. It also does not contain any express forfeiture provision. So if you look at the argument that was made before the district court, the district court found that the Wellmans had continued to accept payments after the 2003-2004 time frame in which the first alleged non-payment occurred and continued to accept royalty payments for a year and three quarters. Then in 2006, after the alleged non-payments that occurred there, continued to accept payments for another year before anything was raised. And if you look at the record, the only documentation that we have that Martha Wellman ever made any complaints about payment and what she was receiving on a lease was October 31, 2007, after she had accepted and cashed the last royalty payment before she decided to just simply collect the payments and not cash them at all. If you look at the case law, there are two separate issues. One, is there a waiver of the ability to pursue missed payments if, in fact, there were? And two, and more importantly for purposes of this case, would non-payments or the failure to pay under a flat rate royalty lease result in a forfeiture of the lease? And if you look at what the district court did, they found that the Wellmans had waived payments because of the fact that they had accepted future payments thereafter. And if you look at the Atlantic Vitalithic case, which is a paving case, and then the Ohio fuel case, which dealt with an oil and gas lease, if a party elects to treat a lease as continuing in nature, then they can't then go back at a later date and say, wait, back in such and such a date, you didn't do this and it's breached as of that point. More importantly, in the absence of a forfeiture provision, and at least this is what we have, non-payment does not result in a forfeiture of the lease. There is a legal remedy. I'm not saying that the Wellmans couldn't come back and say, look, you missed a payment. Bobcat couldn't then turn around and say, well, tough luck, but we get to continue the lease. They would have a legal remedy to pursue recovery of unpaid rents, but it would not entitle them to a forfeiture. And in the Huckel case, which I hope I'm pronouncing correctly, which I think is even more telling, in that case there was a forfeiture provision for non-payment of rentals. But what happened in that case was, is after the alleged non-payments, the landowner continued to accept and cash future payments, and the court found that even though that there was an express forfeiture provision, the fact that the landowner had accepted accrued payments thereafter constituted a waiver. And if you look at syllabus .3 of that case, I think it's directly on point. Syllabus .3 states, if after such rental has accrued and is not paid, whereby a forfeiture exists, the lessor with knowledge thereof receives the rentals accruing after forfeiture, he weighs and cannot enforce the forfeiture. So if there was a situation where the waiver doctrine didn't apply, our assertion would be that the Wellmans would be entitled to go back and argue that there were non-payment for three, four, or five periods, but we're talking about $300, $375. And if that were the issue in this case, I don't believe we'd be standing before you. Any other questions I could ask? I think we understand your position. Thank you very much, Mr. Perry. Thank you very much. Mr. Waters? Thank you, Your Honor. I just want to point out a few things where we take exception of what Mr. Perry just said. Particularly in the Bruin case, you have to look at what the court has said here. The court is not saying that the quantity of production or that the production can become zero and it doesn't affect termination. The court says that quantity of production is irrelevant to the amount of money that the landowner receives, which, of course, is true. That's not the same thing as saying it can become zero, and there was no argument in the Bruin case that it ever became zero. Instead, of course, this was a question of whether production has to be production in paying quantities. If the plaintiff in that case had the facts to assert that it was zero, that there was no production at all, that would have been a much better case for him and certainly wouldn't have to result to making the argument that, well, there was production, but just not in paying quantities, and therefore we want a jury instruction to that effect. They got the jury instruction, and it was found to be erroneous. We don't take exception to the Bruin case. Our position is Bruin is good law and Bryan is good law, Hutchinson is good law, and our position harmonizes all of these cases. It's our contention that Bobcat's position, on the other hand, leads to a conflict between Hutchinson and Bryan on one hand and Bruin, as they interpret it, on the other hand, because if you accept that production can be zero, that zero is a quantity of production, quantity doesn't matter, so quantity, why not be zero? Then you have redlined out the sole termination clause from this lease, and the case where we see this happening that is probably the most analogous to our case is the Hutchinson case. It's a 1939 case. It is after all of the other old cases, McGraw, et cetera, and in that case you had non-production, admitted non-production in the secondary term, unlike McGraw, where the non-production was in the primary term. And with that, the court found that the lease had terminated on its own. Determinable interest, it has expired. Could I ask, if we agree with you about this lease, would we be giving retroactive effect as a practical matter to the current statutory ban? Wouldn't that be the effect of what we would be doing? No, I don't think so, Your Honor. And how so? Because, and I believe Mr. Poling made this point, recognized that flat rate leases are now barred by statute. Correct. A new one, you could not enter into a new one. Correct. But if we were to agree with you with respect to this flat rate lease, it seems to me we would, for all practical purposes, be making that statute retroactive, which would seem to me to have due process issues. It would only affect the situation where you have an old flat rate lease and production has lapsed over the years. There may be hundreds, or I don't know how many there are, but there are flat rate leases out there, production has not lapsed, they would not be affected. But it would, even assuming that production is relevant at all, and I'm assuming for purposes of my question, we would be, in effect, applying this statute to a legislatively undetermined group or unaffected group of leases, of flat rate leases. Wouldn't we, as a practical matter? If you're doing this based on that statute, you probably would. No, it doesn't have to be based on the statute. We would be doing the same thing the statute does. There would be no practical difference. We would just be doing it by judicial fiat, retroactively, which the statute didn't do. What I believe we would be doing is enforcing the specific clause that's in the contract. I don't think it's a due process problem because when the predecessor to Bobcat entered into this lease, they certainly knew from the drafting that there was a termination clause triggered by non-production. In fact, it's the only termination clause that is explicit there in the lease itself. Although the production is a factual, I mean, that's not really the issue in a flat rate lease. There are findings of fact implicit in that, as Bobcat mentioned. So how would we not be extending the statute? Well, all the statute is saying is that you cannot enter into a new flat rate lease in West Virginia in the future. It does not negate the old ones, does not serve to terminate the old ones or accelerate termination. They can still only terminate if the express requirements of the lease are not met, namely the failure to produce or failure to pay or both. And so there would be no devaluing or destruction of these leases just in and of themselves. It would require, of course, that the mineral company fail in the obligation that they've made. And this certainly wouldn't be an expectation that they would have had when the lease was entered into, nor is it one that is affected. Now, there is the rebuttable presumption, and it is rebuttable that with 24 months of continuous non-production that there's been an abandonment. But... So you're saying it's continued? I didn't catch all your question. We had had a bit of a back and forth about whether the 24 months needed to be continuous, and you're acknowledging that it does. Well, the statute is silent on that, but it is a rebuttable presumption. So if you had, as we have in this case, 38% of the time there was non-production over a period of about six years, this does not automatically trigger anything, but it is a rebuttable presumption. So it would be fact-specific in that regard. But our primary contention here is that the plain terms of the lease are what does this, as opposed to being something that is a new right created by the statute coming into play much later. Thank you very much. Thank you, Your Honors. We will step down in Greek Council and proceed directly to the next case.
judges: Allyson K. Duncan, Henry F. Floyd, Stephanie D. Thacker